**Berdie THOMAS, et al.,
Plaintiffs-Appellees,**

v.

**Otis R. BOWEN, Secretary of Health
and Human Services, et al.,
Defendants-Appellants.
Nos. 84–1845, 85–1634.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 15, 1986.

Decided June 9, 1986.

Tricia Margot Berke Vinson, Redwood City, Cal., Susan J. Balliet, East Palo Alto Comm. Law Project, East Palto, Cal., for plaintiffs-appellees.

Freddi Lipstein, Atty., U.S. Dept. of Justice, Washington, D.C., for defendants-appellants.

Before POOLE, BEEZER and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge.

We review the district court's decision that appellants, the Secretaries of Health and Human Services and of the Treasury ("the government"), acted unlawfully in recouping social security benefits erroneously deposited by electronic fund transfer ("EFT") into bank accounts held by appellees after the deaths of their husbands.

### Facts

The three named plaintiffs, Berdie Thomas, Joy Nutter and Inez Polson, are widows whose husbands were receiving social security benefits at the time of their deaths. Pursuant to procedures established by the Social Security Administration ("SSA") and the Department of the Treasury ("Treasury"), the recipients' monthly social security benefits were paid directly into their bank accounts by EFT.

Upon the deaths of their husbands, each widow promptly notified SSA, closed the joint bank account she had shared with her husband, and requested that SSA deposit her own benefits into a new account. In each case, SSA failed to respond promptly to the notification and continued to pay benefits to the deceased husband. In Thomas' case, her own benefits, as well as those erroneously certified to her husband, were deposited into a closed joint account for five months after his death. The bank periodically allowed her to transfer funds from the closed account to her new account.

In Nutter's case, her own benefits went directly into her new account, while her husband's benefits continued to be deposited in a joint account that was supposedly closed. Apparently on its own initiative, the bank transferred the funds into Nutter's new account. In Polson's case, her husband's benefits continued to be paid into a closed joint account (from which Polson eventually withdrew the funds) for several months after his death.

Treasury sent a Notice of Accountability to each of plaintiffs' banks, demanding return of payments erroneously certified to their husbands. Treasury did not notify the plaintiffs or inform them of the amount it claimed from their accounts.

Thomas' bank withdrew $1,389.05, the total amount in the account, and returned it to Treasury. SSA then demanded that Thomas repay the remaining $222.45. Nutter's bank debited her new account and returned to Treasury the entire amount demanded, $463.40, leaving the account overdrawn by $235.10. The bank then made up the difference by taking part of Nutter's April 1981 widow's benefits.

Because there were no funds in Polson's account when Treasury sent the Notice of Accountability, SSA demanded $1,494.90 from her directly. Polson initially agreed to a monthly deduction of $20.00 from her widow's benefits, but SSA advised her that $97.50 per month would be withheld. Polson then withdrew her consent for voluntary repayment and SSA made no further effort to recover the balance.

Section 204(b) of the Social Security Act, 42 U.S.C. § 404(b), provides that "[i]n any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any

person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity or good conscience." Pursuant to regulations, SSA must notify an individual who has been overpaid that he may request waiver, and also provide him procedural protections, including a hearing. 20 C.F.R. §§ 404.502(a), 404.900 et seq.

Each of the widows requested SSA to waive recoupment of the funds. SSA refused, taking the position that the waiver provisions, and the concomitant right to notice and hearing, do not apply to these payments because they were erroneous payments rather than overpayments. In the government's view, the term overpayment only applies to funds paid to a designated beneficiary in excess of the amount due him. When the money is paid to someone other than the designated beneficiary—here the beneficiary's widow—it is not an overpayment, the government contends, and therefore not subject to waiver of recoupment under 42 U.S.C. § 404(b).

## Proceedings Below

Plaintiffs filed suit in the district court, claiming that the recovery procedures violated their constitutional right to due process and equal protection, as well as the statutory rights under 42 U.S.C. § 404 (which specifies procedures for recovering overpayments) and § 407 (which exempts Social Security benefits from "execution, levy, attachment, garnishment, or other legal process ..."). Plaintiffs did not claim they were entitled to the funds, but contended that they had a right to seek waiver of recovery under 42 U.S.C. § 404(b), and were also entitled to notice and hearing under the SSA regulations and the due process clause.

The district court initially granted defendants' motion for summary judgment. The court found that the banks had not been authorized by the government to credit the plaintiffs' accounts with the erroneous payments or to withdraw the funds. However, the court believed a cause of action might lie against the banks under 42 U.S.C. § 407 and allowed plaintiffs thirty days to amend their complaint.

Upon consideration of the amended complaint, the district court vacated its prior ruling and granted plaintiffs' motion for summary judgment. Finding that the purposes of the Social Security Act were best served by construing the payments made after the death of the beneficiaries as overpayments rather than erroneous payments, the court held that the government could not recoup funds out of appellees' accounts without first giving them an opportunity to apply for waiver of recoupment pursuant to 42 U.S.C. § 404(b) and 20 C.F.R. § 404.-502(a). The court also held that the widows had a property interest in their bank accounts and that due process required that they be allowed to contest the government's claim before their bank accounts were debited. However, the court found that the debiting constituted state action only against Thomas, because in the other cases, the banks debited the accounts on their own initiative and pursuant to contracts with Nutter and Polson.

The court also certified a class "consisting of all California residents who have had or will have their bank accounts debited or their social security benefits reduced by defendants' actions to recover Title II benefits certified to deceased beneficiaries, where defendants fail to provide prior notice of the overpayment or an opportunity for a hearing regarding the amount of overpayment, waiver of recovery, and repayment in installments." *Thomas v. Secretary of Health and Human Serv.*, No. C 81–2485 SW, slip op. at 17–18 (N.D.Cal., Sept. 14, 1983). The court later granted plaintiffs $24,900 in attorney's fees under the Equal Access to Justice Act on the ground that the government's position had not been substantially justified. Finally, the court permanently enjoined the government from recovering EFT payments to deceased beneficiaries without giving joint account holders prior notice and providing an administrative forum to challenge the overpayment determination and to seek a waiver of recovery. Soon after entry of the permanent injunction, defendants

ceased efforts to recover erroneous social security benefit payments in California.

## Appellants' Contentions

The government contends that the district court erred in holding that the EFT payments to appellants' bank accounts constitute overpayments, which entitle them to request waiver of recoupment, as opposed to erroneous payments, which give them no such right. The government also argues that the widows have no property interest in the erroneously made payments and therefore no due process right to notice and hearing before the government tries to recoup the funds. The government also takes issue with the district court's orders certifying the class and awarding attorney's fees.

## Discussion

This case is squarely controlled by *Powderly v. Schweiker,* 704 F.2d 1092 (9th Cir. 1983), which compels reversal of the district court's decision on the first two grounds advanced by appellants, rendering moot the other issues presented.

### A. *Waiver of recoupment*

As noted, the district court determined that the payments made to the deceased husbands were overpayments and therefore subject to waiver of recoupment pursuant to 42 U.S.C. § 404(b). The district court rejected the government's contention that only excessive payments made to designated beneficiaries are overpayments, and that payments made to deceased beneficiaries are erroneous payments not covered by the waiver provision. In so doing, the district court incorrectly applied our ruling in *Powderly.*

*Powderly,* like this case, was brought by a widow challenging the government's recoupment procedures for payments erroneously made to her deceased husband. Like appellees here, Powderly claimed that the

payments in question constituted overpayments and that she was therefore entitled to procedural protections pursuant to 42 U.S.C. § 404(a) & (b). *See Powderly,* 704 F.2d at 1095–96. The court held that "the overpayment waiver provisions of § 404(b), *supra,* are intended to benefit only designated payees who, through no fault of their own, have received more benefits than those to which they are entitled." *Id.* at 1096. Because the widow Powderly was not the designated payee—her deceased husband was—the court held that the payment in question was not an overpayment but an erroneous payment and she was not entitled to the waiver provisions of section 404(b).

The only material difference between this case and *Powderly* is that *Powderly* involved a check made payable to the deceased husband and cashed by the widow upon an improper endorsement, rather than an EFT payment electronically transmitted into the widow's account. *Id.* at 1094. Appellees seize upon this difference to distinguish *Powderly.* Under the reasoning of *Powderly,* however, the manner in which the payment was made is not material to whether something is an overpayment or an erroneous payment. That distinction turns upon whether or not the payment was received by the designated payee or by someone else. In both *Powderly* and this case, the designated payee was the deceased husband and the money was received by his widow. Once this fact is accepted as dispositive, as the *Powderly* court did, it follows that the payments here were erroneous payments not overpayments.[1]

Appellees also point to language in *Powderly* suggesting that the widow acted wrongfully in cashing the check made payable to her husband, and argue that we should reach a different result in this case

1. Congress has since amended sections 204(a) and 1631(b) of the Social Security Act to clarify the status of payments made on behalf of deceased individuals by direct deposit into accounts shared with another person. Under the new regulations, these are treated as "pay-

ment[s] of more than the correct amount to such other person." Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L. No. 99–272 § 12113, 1986 U.S.Code Cong. & Ad. News (100 Stat.) 288 (to be codified at 42 U.S.C. §§ 204(a) and 1631(b)).

because no such misconduct occurred. The widow's conduct was not, however, material to the court's analysis in *Powderly*.[2] Nor does it make sense that it would be. Whether the recipient acted wrongfully only becomes relevant when there has been an overpayment, because only a "person who is without fault" is entitled to waiver. 42 U.S.C. § 404(b).

On the basis of *Powderly*, we hold that the payments at issue here were erroneous payments and not overpayments, and that appellees were therefore not entitled to waiver under section 404(b).

### B. *Denial of Due Process*

 The district court also held that the widows had been denied due process when funds were removed from their accounts by EFT. Once again, however, *Powderly* squarely addressed the question and reached a contrary conclusion, one that is binding on us here.

The widow in *Powderly* made the identical argument raised by appellants here and the court rejected it, holding that "[a]ppellant has not shown that she has a protected property interest in the funds." *Powderly*, 704 F.2d at 1097. The court noted that "[p]roperty interests do not arise whenever 'an individual has an abstract need or desire for,' or 'unilateral expectation of,' a benefit." *Id.*, citing *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Noting further that the widow was not claiming any threat to her own social security benefits, the court concluded as follows:

In reality, she is attempting to claim a property interest in the funds erroneous-

ly sent to her deceased husband, but cannot escape the fact that she has no entitlement to these funds. Appellant has failed to demonstrate that she was deprived of an interest that could invoke procedural due process protection.

*Powderly*, 704 F.2d at 1097. The court also dismissed as "groundless" Powderly's claim to "a property interest by reason of her own bank account." *Id.*

Appellees' claims, and the district court's ruling that sustained them, cannot survive scrutiny in light of *Powderly*. We therefore reverse on this issue as well.

### Conclusion

Having determined that appellees are not entitled to recover on their statutory and constitutional claims, we need not reach appellants' other claims involving the propriety of class certification and the award of attorney's fees. We therefore reverse the district court's judgment and vacate its orders certifying the plaintiff class, enjoining the government from recovering erroneous payments and awarding attorney's fees against the government.

KOZINSKI, Circuit Judge, concurring.

While, for the reasons explained above, I believe this case is squarely controlled by *Powderly v. Schweiker*, 704 F.2d 1092 (9th Cir.1983), I write these additional thoughts to express concern about *Powderly*, at least as it applies to appellant Berdie Thomas.[1] The majority in *Powderly* gave short shrift to the widow's due process claim and held that the government could unilaterally debit her bank account to recoup funds she had received by cashing her deceased husband's check.[2] I see a serious tension be-

---

**2.** As a matter of fact, the court noted her explanation that she cashed the check on instructions from SSA. 704 F.2d at 1094.

**1.** The bank removed funds from Mrs. Thomas' account on the direction of the government. This was the basis of the district court's determination that removal of the funds constituted state action. At oral argument before us, government counsel conceded that the removal of funds from Thomas' account was state action. Removal of funds from the accounts of the other named plaintiffs was not done at the di-

rection of the government and probably does not amount to state action. *Compare Powderly*, 704 F.2d at 1099 (Fletcher, J., concurring) (no state action), *with Breault v. Heckler*, 763 F.2d 62, 65 (2d Cir.1985) (state action).

**2.** As Judge Fletcher noted in her concurring opinion, the court need not have reached the constitutional issue because the debiting was done by the bank on its own initiative and therefore was not state action. 704 F.2d at 1099. By bypassing the state action issue and resolving the merits of the constitutional claim,

tween this ruling and established principles of private property. My concern is the apparent absence of any lawful authority for the government to reach into Mrs. Thomas' bank account and extract the funds it claims.

Bank accounts are contracts between private parties. These contracts, and the laws governing them, establish a property interest in the funds held by the bank on behalf of the depositor. *See Anderson National Bank v. Luckett,* 321 U.S. 233, 240, 64 S.Ct. 599, 603, 88 L.Ed. 692 (1944). Once funds are placed in the account, they may be removed only under the following circumstances: (a) by the depositor or someone authorized by him, *see* Cal.Fin.Code § 953 (Deering 1978); (b) by the bank pursuant to its contractual arrangement or in accordance with state law governing the banker/depositor relationship, *see* Cal.Fin.Code § 864 (Deering 1978); or (c) by someone acting pursuant to lawful authority, such as a writ of execution and a notice of levy, Cal.Civ.Proc.Code § 701.010 (Deering 1983). As best I can tell, none of these apply here.

The money was not removed by Mrs. Thomas, nor does the government claim to have had Mrs. Thomas' consent to unilaterally debit her account in case of an erroneous payment or under any other circumstances. Nor did the government appear to have acted pursuant to statute or regulation. Neither the Social Security Act, nor its regulations, nor the Treasury regulations dealing with the handling of direct deposits, gives the government the authority to tamper with private bank accounts. Banks do have a lien under state law for debts owed to *them* by their customers. Cal.Civ.Code § 3054; *see Bromberg v. Bank of America,* 58 Cal.App.2d 1, 6–7, 135 P.2d 689, 692 (1946). Nothing, however, appears to authorize banks to reach into customers' accounts to satisfy debts owed to third parties. *See Cory v. Golden State Bank,* 95 Cal.App.3d 360, 369, 157 Cal.Rptr. 538, 543 (1979) (no right of setoff unless there is first some indebtedness running from the customer to the bank).

The fact that the government claims entitlement to the money in Mrs. Thomas' account is not, of itself, a basis for going in and taking it. Our legal system does not afford creditors a general self-help remedy. *See Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Absent some contractual arrangement or legal authority, a creditor may not satisfy a debt simply by seizing the debtor's assets. *See Melara v. Kennedy,* 541 F.2d 802, 805 (9th Cir.1976). Where property is not subject to a lien or security interest, a creditor may not help himself to a debtor's car or equipment or household furniture to satisfy an obligation. *Id.* at 807; *see* Restatement (Second) of Torts §§ 100–110 (1985). He certainly may not forge a check on the debtor's bank account. Absent proper legal authorization, the government must go into court, like everyone else, to have its claim adjudicated and converted into a judgment.[3]

Nor do I share the view, advanced by Judge Fletcher in *Powderly,* 704 F.2d at 1099, that the problem would be resolved if the government had offered Thomas notice and an administrative hearing before debiting her account. Procedural due process only comes into play after the government has shown that its actions are substantively authorized. Indeed, it is impossible to consider what procedures are appropriate without knowing the source of the government's authority. For example, if the government debits the account pursuant to an agreement signed by the recipient, it may do so unilaterally and without prior notice. *Cf.* Cal.Fin.Code § 953 (Deering 1981) (banks may permit withdrawals from

---

*id.* at 1097, the court necessarily assumed that the debiting had been done by, or on behalf of, the government.

**3.** The government is in no better position because the erroneous deposit may have established a constructive trust. *See United States v.*

*Pegg,* 782 F.2d 1498 (9th Cir.1986); Cal.Civ.Code §§ 2223, 2224 (Deering 1984). I am aware of no authority for the proposition that the beneficiary of a constructive trust is entitled to exercise self-help.

depositor's account by authorized third parties). On the other hand, if the debiting is done pursuant to statute or regulation, the procedures provided therein would have to be measured against constitutional standards. *See, e.g., Anderson National Bank v. Luckett,* 321 U.S. 233, 64 S.Ct. 599, 88 L.Ed. 692 (1944) (state statute governing abandoned bank deposits found not to violate constitutional due process requirements). No measure of procedural fairness, however, can validate an action that is substantively beyond the government's authority. *Rutherford v. City of Berkeley,* 780 F.2d 1444, 1447 (9th Cir.1986).

Because of a recent change in its collection procedure, the government is unlikely to repeat the conduct that gave rise to Thomas' claim.[4] Yet this case and *Powderly* remain as troubling precedents for the millions of Americans who receive government payments in the form of checks or electronic fund transfers. Errors are inevitable and the government must be able to recoup money it has erroneously paid out.[5] Equally inevitable, however, are errors in identifying and correcting errors. Disputes will arise from time to time and experience teaches that the government will sometimes be in the wrong. What *Powderly* and this case suggest is that the government may seize money it claims, or its equivalent, based on its own determination of error and without the need to show legal authorization. This, in my view, impermissibly blurs established principles of private property, rights fundamental to a free society. *See Lynch v. Household Fi-*

nance, 405 U.S. 538, 552, 92 S.Ct. 1113, 1122, 31 L.Ed.2d 424 (1972) ("rights in property are basic civil rights"); *Fuentes,* 407 U.S. at 81, 92 S.Ct. at 1994 ("[there is a] high value, embedded in our constitutional and political history, place[d] on a person's right to enjoy what is his, free of governmental interference").

---

4. The Treasury Department's collection procedures are spelled out for financial institutions in a publication called The Green Book. The 1977 edition, which was in effect until 1984, directed banks to withdraw the amount claimed by the government from the customer's account. A revised version, promulgated after the district court's summary judgment in this case, notes that banks are not authorized to debit customer's accounts by either 31 C.F.R. § 210 or Treasury procedures, and that any right to withdraw funds must be based on a contract with the customer or on state law. 31 C.F.R. § 210.-11(c).

5. The government is free to deal with the problem of erroneous payments in a variety of ways,

such as making consent for unilateral recoupment part of the EFT agreement or passing a statute or promulgating a regulation. Requiring government to pursue these avenues is not an exercise in unnecessary formalism. Procedural requirements frequently have substantive consequences. A provision in the EFT agreement allowing recoupment might deter some people from participating in the program; others may keep their balance low to avoid recoupment. Statutory or regulatory provisions implicate the political process, an important check on arbitrary government action. A statute might not pass; a proposed regulation may evoke sufficient protest to bar implementation.